1
2
3
4

**INSTITUTE FOR JUSTICE**
Jeffrey Rowes (admitted *pro hac vice*)
816 Congress Ave., Suite 960
Austin, TX 78701
(512) 480-5936
jrowes@ij.org

5
6
7
8

Benjamin A. Field (admitted *pro hac vice*)
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
bfield@ij.org

9
10
11
12

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Thomas V. Loran III (CA Bar No. 95255)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
(415) 983-1865
thomas.loran@pillsburylaw.com

13
14
15

Derek M. Mayor (CA Bar No. 307171)
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4703
derek.mayor@pillsburylaw.com

16
17
18

*Attorneys for Plaintiffs Full Circle of Living and Dying; Bonnie "Akhila" Murphy; Donna Peizer; Pamela Yazell; Kay Hogan; Janaia Donaldson; and Robin Mallgren*

19
20

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

21
22
23
24
25
26
27
28

FULL CIRCLE OF LIVING AND DYING, et al.,

　　　　　　　Plaintiffs,

v.

GINA SANCHEZ in her official capacity as Bureau Chief of the Cemetery and Funeral Bureau, et al.,

　　　　　　　Defendants.

No. 2:20-cv-01306-KJM-KJN

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Date:　　　　December 17, 2021
Time:　　　　10:00 a.m.
Courtroom:　3, 15th Floor
Judge:　　　Hon. Kimberley J. Mueller

-1-

1

**TABLE OF CONTENTS**

2

Pᴀɢᴇ

Table of Authorities ....................................................................................................... 3

Introduction .................................................................................................................... 5

Statement of Undisputed Material Facts ........................................................................ 6

   I.   End-of-Life Doulas Help the Dying and Assist with Home Funerals. .............................. 6

   II.  Plaintiff Full Circle and Its Volunteers Serve Nevada County. ....................................... 7

   III. The Bureau Orders Full Circle To Stop Helping People Until Licensed........................... 8

   IV. Full Circle Files Suit To Protect Itself, Its Doulas, and Those They Help. ..................... 11

   V.  Plaintiffs Win a Preliminary Injunction and the Bureau Withdraws the Citation............. 11

Standard of Review ...................................................................................................... 12

Argument ...................................................................................................................... 12

   I.   Plaintiffs Are Entitled to Judgment on Their Speech Claims. .......................................... 12

        A.  This Court's Preliminary Injunction Correctly Set Out the
            First Amendment Test. .................................................................................... 12

        B.  Discovery Has Confirmed the Bureau Cannot Satisfy
            First Amendment Scrutiny............................................................................... 13

        C.  The Bureau's Enforcement also Fails the Vagueness Prohibition. ........................... 17

   II.  Plaintiffs Are Entitled to Judgment on Their Due-Process Claim. ................................... 19

        A.  Requiring Full Circle and Its Doulas To Be Licensed Violates
            Substantive  Due Process.................................................................................. 19

        B.  *St. Joseph Abbey* Provides a Direct Path to Judgment for Plaintiffs. ...................... 20

Conclusion .................................................................................................................... 23

1

# TABLE OF AUTHORITIES

2

**CASES**                                                                    **PAGE(S)**

3

*Anderson v. Liberty Lobby, Inc.*,

4

477 U.S. 242 (1986) ............................................................................ 12

5

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,

564 U.S. 721 (2011) ............................................................................ 14

6

7

*Brown v. Entm't Merchs. Ass'n*,

564 U.S. 786 (2011) ............................................................................ 14

8

*Casket Royale, Inc. v. Mississippi*,

9

124 F. Supp. 2d 434 (S.D. Miss. 2000) ............................................. 23

10

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,

447 U.S. 557 (1980) ............................................................................ 16

11

12

*Cornwell v. Hamilton*,

80 F. Supp. 2d 1101 (S.D. Cal. 1999) ............................................... 23

13

*Craigmiles v. Giles*,

14

312 F.3d 220 (6th Cir. 2002) .............................................................. 23

15

*Edenfield v. Fane*,

507 U.S. 761 (1993) ............................................................................ 16

16

17

*FCC v. Fox TV Stations, Inc.*,

567 U.S. 239 (2012) ............................................................................ 17

18

*Gentile v. State Bar of Nev.*,

19

501 U.S. 1030 (1991) .......................................................................... 17

20

*Grayned v. City of Rockford*,

408 U.S. 104 (1972) ............................................................................ 17

21

22

*Holder v. Humanitarian Law Project*,

561 U.S. 1 (2011) ................................................................................ 14

23

*Hynes v. Mayor & Council of Oradell*,

24

425 U.S. 610 (1976) ............................................................................ 17

25

*Merrifield v. Lockyer*,

26

547 F.3d 978 (9th Cir. 2008) ................................................... 19, 20, 23

27

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,

28

961 F.3d 1062 (9th Cir. 2020) ................................................... 13, 15

*Peachtree Caskets Direct, Inc. v. State Bd. of Funeral Serv.*,
    No. 1:19-cv-3084, 1999 WL 33651794 (N.D. Ga. Feb. 9, 1999) ........................................... 23

*Reno v. ACLU*,
    521 U.S. 844 (1997) .......................................................................................................... 17

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (5th Cir. 2013) .................................................................................. 20, 21, 22

*Stanley v. Georgia*,
    394 U.S. 557 (1969) .......................................................................................................... 15

*Turner Broad. Sys., Inc. v. FCC*,
    520 U.S. 180 (1997) .......................................................................................................... 13

*United States v. Playboy Entm't Grp.*,
    529 U.S. 803 (2000) .......................................................................................................... 13

*United States v. Stevens*,
    559 U.S. 460 (2010) .......................................................................................................... 18

*United States v. Williams*,
    553 U.S. 285 (2008) .......................................................................................................... 18

*Wal-Mart Stores, Inc. v. Knickrehm*,
    101 F. Supp. 2d 749 (E.D. Ark. 2000) ............................................................................... 23

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*,
    536 U.S. 150 (2002) .......................................................................................................... 15

**CODES, RULES, AND REGULATIONS**

16 C.C.R. §§ 1244–45 ............................................................................................................... 12

16 C.C.R. § 1259 ........................................................................................................................ 8

Cal. Bus. & Prof. Code
    § 7607 .............................................................................................................................. 8
    § 7615 .............................................................................................................................. 8
    § 7616 ......................................................................................................................... 8, 21
    § 7617 .............................................................................................................................. 8
    § 7619 .............................................................................................................................. 8
    § 7622 .............................................................................................................................. 8
    § 7630 .............................................................................................................................. 8
    § 17200 ........................................................................................................................... 15

Cal. Health & Safety Code § 7103(a) ......................................................................................... 7

Fed. R. Civ. P. 56 ..................................................................................................................... 12

Plaintiffs Full Circle of Living and Dying; Bonnie "Akhila" Murphy; Donna Peizer; Pamela Yazell; Kay Hogan; Janaia Donaldson; and Robin Mallgren hereby submit the following Memorandum of Points and Authorities in support of Plaintiffs' Motion for Summary Judgment.

## INTRODUCTION

Plaintiffs Akhila Murphy and Donna Peizer are end-of-life doulas. They, along with the other volunteers at Plaintiff Full Circle, help people in two general ways—one involving speech and one involving conduct. On the speech side, the doulas provide individualized advice to people who want to make plans for their final moments of their lives and, in some cases, a home funeral after passing. This isn't medical advice. It is practical advice about planning where death will occur, who will be there, what their roles will be, and whether a home funeral will happen. On the conduct side, the doulas also provide practical hands-on assistance to families who want to hold the funeral themselves in a private home. This assistance also isn't technical. It involves simple activities that are merely unfamiliar—such as, moving a deceased person from a bed to another room for a ceremony, washing and dressing remains, or using dry ice to provide temporary preservation. Home funeral activities are legal for laypeople to perform themselves.

This case arose because someone filed a complaint with the California Cemetery and Funeral Bureau alleging that the doulas were acting as a funeral establishment without state licenses.[1] That triggered an investigation and Bureau order that Full Circle and its doulas stop what they were doing. The Bureau requires the doulas—most of whom are retired volunteers—to become funeral directors, and requires Full Circle to become a full-fledged funeral establishment with a physical building for storing or embalming remains. Plaintiffs brought First Amendment and substantive due-process claims.

Plaintiffs now seek summary judgment. First, they ask the Court to convert the preliminary injunction on the speech claims to a permanent injunction because the record forecloses the Bureau's ability to justify its speech restrictions under any standard of heightened First Amendment scrutiny (Part I). Second, they seek judgment on their substantive due-process claim

---

[1] Plaintiffs refer to the three defendants collectively as the "Bureau."

-5-

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (2:20-CV-01306-KJM-KJN)

because the Bureau has no rational basis for requiring the doulas and Full Circle to obtain state funeral licenses simply to continue peaceably and safely helping at home funerals (Part II). Full licensure is so burdensome that a ruling for the Bureau will end what Full Circle and its doulas do. Respectfully, this Court should not allow that.

STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.   End-of-Life Doulas Help the Dying and Assist with Home Funerals.**

An end-of-life ("EOL") doula helps families who want a family-led dying process and home funeral. She may assist at three points. Plaintiffs' Statement of Undisputed Material Facts ("SUMF") ¶¶ 1–2. *First*, before there is any acute need, she may help plan for the end of life, including the process of dying itself and the funeral. SUMF ¶ 2. *Second*, in the final weeks or days before death, she may be present, focusing on the practical and emotional needs of the dying, just as a birth doula does for a mother in childbirth. SUMF ¶ 3. She may read a spiritual passage, lead a song, or simply offer a glass of water. *Id.* An EOL doula is not a medical professional. *Id.* She does not treat the dying, slow or hasten their deaths, or administer medication. *Id.* **Last**, an EOL doula may also assist during a home funeral. SUMF ¶ 4.

At a home funeral, the family cares for a deceased loved one themselves in a private home. Home funerals are simple and personal. SUMF ¶ 5. A person may die at home or may be brought home after dying. SUMF ¶ 6. Family members may ceremonially bathe and dress the remains. SUMF ¶ 7. The deceased then often lies in honor within a bedroom or living room where family and friends may pay their final respects and support grieving family members. SUMF ¶ 8. Family and friends may decorate a burial container with drawings or messages. SUMF ¶ 9.

The EOL doula provides practical advice and hands-on assistance to families conducting a home funeral. SUMF ¶ 24. She does this not because the tasks are inherently difficult, but because they are unfamiliar to most people. SUMF ¶ 26. Positioning dry ice, for example, isn't hard, but few people have done it. *Id.*

Home-funeral families—and the EOL doulas who help them—do not engage in activities beyond the capabilities of a layperson. SUMF ¶ 10. They do not, for example, declare death,

-6-

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (2:20-CV-01306-KJM-KJN)

embalm remains, or perform any other task that requires specialized technical training. *Id.*

Home funerals are safe. SUMF ¶ 11. They are legal in California, as in all 50 states, because human remains do not pose a health-and-safety risk. *Id.* California law requires only that remains be interred or cremated within a "reasonable" time. CAL. HEALTH & SAFETY CODE § 7103(a). A home funeral generally lasts between a few hours and three days. SUMF ¶ 11.

## II.  Plaintiff Full Circle and Its Volunteers Serve Nevada County.

Plaintiff Full Circle is a tiny nonprofit in Nevada County. On a shoestring budget of under $11,000, it educates the public about end-of-life options—from hospice and dying at home, to medical assistance in dying, to planning for the final transition into death, to home funerals, to eco-friendly burial and cremation, to conventional services from funeral directors. SUMF ¶¶ 12–13, 17. Its volunteers offer two services relevant here: (1) individualized advice and (2) hands-on assistance.

**1.  Speech**: An EOL doula provides individualized advice to families in two ways. First, she speaks with families to create individualized end-of-life plans, including home-funeral plans. SUMF ¶ 19. Using Full Circle's questionnaires, the doula explores issues like: what will the final weeks, days, and hours look like; where will the person die; what are her spiritual beliefs and needs; who will be there at the moment of death; will there be a home funeral; if so, how will the deceased be brought home (or is the plan to die at home); where will the deceased lie in honor; what will the deceased wear and who will dress her; how will visitations proceed; who will transport the remains for final disposition; does the family need a doula to be present to assist with the home funeral? SUMF ¶ 20. These conversations result in detailed written plans for when the time comes. SUMF ¶ 21. Full Circle charges a flat fee of $150–300 for preparing these plans. SUMF ¶ 22.

Second, a doula may provide individualized advice to families during home funerals. SUMF ¶¶ 19, 23. Present in the home, she may coach the family through the steps of the home-funeral plan, providing practical tips and emotional support as a family performs the tasks that they may legally do themselves. SUMF ¶ 23. Full Circle asks for a donation for a home funeral on

-7-

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (2:20-CV-01306-KJM-KJN)

a sliding scale based on ability to pay—typically $500–2,000—but the donation isn't required. SUMF ¶¶ 31–32.

**2.   Hands-On Assistance**: A doula attending a home funeral may take one more step beyond simply speaking in the form of practical advice. She may also provide hands-on assistance to demonstrate a task such as placing dry ice. SUMF ¶¶ 24–26. As with the speech, none of this assistance is technical, unlawful for a layperson to perform, or beyond the capabilities of an ordinary person. SUMF ¶¶ 25–26, 29. But this practical, hands-on assistance can be of immense value during the experiences that make home funerals profound. SUMF ¶ 29. For example, Akhila helped Plaintiff Pamela Yazell and her family with her husband Bob's home funeral. SUMF ¶ 30. Among other things, Akhila showed them how to remove Bob's hospital clothes and dress him in his favorite golf attire. *Id.* For Pamela and her family, these final gestures of care, of laying hands on a loved one for the last time, were deeply moving. *Id.* This was also something her family wouldn't have had the confidence to do without Akhila's hands-on assistance. *Id.*

**III.  The Bureau Orders Full Circle To Stop Helping People Until Licensed.**

**1.   Licensure**: This case is about whether the Bureau can require Full Circle to obtain a "funeral establishment" license and its volunteers to obtain "funeral director" licenses. A "funeral establishment" is "a place of business" in a building with "a specific street address" that is "devoted exclusively" to activities "incident, convenient, or related to the preparation and arrangements . . . for the funeral, transportation, burial or other disposition of human remains." CAL. BUS. & PROF. CODE §§ 7616, 7616.2, 7617. The building must have "a suitable room for the storage of human remains" or a "preparation room" equipped "for the preparation, sanitation, or embalming of human remains." *Id.* at § 7616(a). A funeral establishment is subject to ongoing Bureau supervision and license renewals. *Id.* at §§ 7607, 7630; 16 C.C.R. § 1259. A "funeral director" is "a person engaged in . . . [m]aintaining a funeral establishment for the . . . care of human remains." CAL. BUS. & PROF. CODE § 7615. An associate degree is required, the applicant must pass a Bureau exam, and she may work only out of a licensed funeral establishment. *Id.* §§ 7619, 7619.3, 7622.

-8-

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (2:20-CV-01306-KJM-KJN)

**2. Investigation**: On August 7, 2019, the Bureau received an anonymous complaint alleging that Full Circle was operating as a funeral establishment without a license. SUMF ¶ 43. Field Representative Glenn Miller began a six-week investigation. SUMF ¶ 44. He reviewed Full Circle's website and printed out (and marked up) pages that indicated unlicensed activity. *Id*. In his investigative report and later deposition, Miller focused on speech (individualized funeral planning, speech during a home funeral, and advertising of those services) and hands-on assistance (*e.g.*, washing and dressing remains, using dry ice to preserve them) as statutory violations. SUMF ¶ 45.

Meanwhile, he also spoke to Akhila. SUMF ¶ 46. Coincidentally, she called him two days after the anonymous complaint was filed, hoping he could help her better understand California funeral law so Full Circle could better inform the public and clients. SUMF ¶ 47. During their August 28 call, he "informed Murphy that a complaint had been filed" and that "she was performing services that are normally provided by a funeral establishment, it was unlicensed activity." SUMF ¶ 48.

Miller periodically reviewed the Full Circle website in September 2019, observing each time that Full Circle continued to operate as a funeral establishment. SUMF ¶ 49. For example, on September 9, a "confidential informant" alerted him to an upcoming "educational event" that Full Circle planned for Hospice of the Foothills in Grass Valley. SUMF ¶ 50. Miller noted: "After review of the printout [event ad] I observed that Murphy and Full Circle were still engaging in the acts of a funeral establishment, even after being advised of unlicensed activity." *Id*.

**3. Citation, Informal Conference, Affirmance**: On September 27, Miller completed his report, concluding that "the allegation [of unlicensed activity] is substantiated." SUMF ¶ 51. Three officials of increasing seniority vetted his report and evidence up the chain of command, including at the Bureau Chief level. SUMF ¶¶ 52–53. At each stage, the official agreed with Miller. *Id*.

On November 19, 2019, the Bureau issued Akhila and Full Circle a "NOTICE OF CITATION AND ASSESSMENT OF FINE" ("Citation"). SUMF ¶ 54. The Citation stated that "Glenn Miller, a Field Representative for the Bureau, conducted an investigation into a complaint filed against Full Circle of Living and Dying." SUMF ¶ 55.The Citation asserted that "Full Circle

of Living and Dying advertises services on its website . . . for which a funeral establishment license is required." *Id*. The Citation also included an Order of Abatement: "The Bureau hereby directs that you immediately discontinue advertising and operating as a funeral establishment until a license is issued by the Bureau." SUMF ¶ 56.

The Citation did not explain what specifically Full Circle and its doulas were doing wrong. SUMF ¶ 57. It did not include a copy of Miller's report or his marked-up copies from the Full Circle website. *Id*. This opacity is official Bureau policy. SUMF ¶ 59. The Bureau considers explaining itself to the citizens it targets to be impermissible "legal advice." *Id*. The Bureau's position is that Full Circle, after being cited for operating without a funeral-establishment license, was supposed to hire a lawyer who would somehow independently figure out the facts and conclusions in Miller's secret report. *Id*.

This policy was on display at the December 17 informal conference, which Akhila requested because Full Circle had no idea what, if anything, it could do to comply with the licensing statutes. SUMF ¶ 61. Three Bureau staff attended: Miller and his superiors. SUMF ¶ 62. Plaintiff Donna Peizer asked to record the conference. SUMF ¶ 63. Bureau staff refused. SUMF ¶ 64. They then sat silently, staring at Akhila and Donna. SUMF ¶ 65. As the silence grew uncomfortable, it became clear that Bureau staff did not intend to explain the Citation. *Id*. So Donna asked them to. SUMF ¶ 66. They refused. *Id*. Instead, they told Akhila and Donna to hire an attorney to tell them why the Bureau issued the Citation. *Id*. Near the end, Bureau staff stated that funeral-establishment and funeral-director licenses were necessary, emphasizing the Bureau's need to "inspect" their operation and "examine" their fees. SUMF ¶ 67. The staff also noted that "the funeral industry does not appreciate competition." SUMF ¶ 68.

After the conference, Miller's supervisor and conference attendee Amber Weaver wrote a memorandum to her boss Ayriel Storm, who also attended, recommending that the Citation be affirmed. SUMF ¶ 69. Storm agreed, as did her boss Sandra Patterson, the deputy Bureau chief. SUMF ¶ 70. On December 24, Patterson issued an affirmance in Bureau Chief Sanchez's name: "[N]othing in [Akhila's] or [Donna's] rebuttal provides any reason or belief that the findings of the investigation or the citation were incorrect in their facts." SUMF ¶ 71.

-10-

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (2:20-cv-01306-KJM-KJN)

**IV. Full Circle Files Suit To Protect Itself, Its Doulas, and Those They Help.**

On June 30, 2020, Full Circle, doulas Akhila and Donna, and four people who want their planning and hands-on assistance filed this constitutional challenge. ECF No. 1. The Complaint alleges that the Bureau's application of funeral licensure violates their First Amendment right to give and receive individualized advice, Full Circle's right to advertise its services, and each Plaintiff's right to provide or receive hands-on assistance at a home funeral. *Id.* ¶¶ 225–65. On July 27, 2020, Plaintiffs moved for a preliminary injunction on their speech claims. ECF No. 12. Meanwhile, on August 21, 2020, the Bureau moved to dismiss all claims. ECF No. 13.

**V. Plaintiffs Win a Preliminary Injunction and the Bureau Withdraws the Citation.**

Everyone at the Bureau who read Glenn Miller's report agreed with it. *See supra* pp. 9-10. Everyone agreed that the Citation should issue and that it should be affirmed. *Id.* The Bureau defended its application of funeral licensure in its preliminary-injunction and motion-to-dismiss briefing. SUMF ¶ 82. On December 29, 2020, the Court denied the motion to dismiss and granted the preliminary injunction. ECF No. 23. Then the Bureau flipped. Suddenly, it decided its Citation was meritless. On January 20, 2021, Bureau Chief (and Defendant) Sanchez sent Akhila a letter stating: "I have determined that the Citation was issued in error without a complete and adequate investigation of all the relevant factual circumstances." SUMF ¶¶ 84–85. The Bureau did not conclude that Full Circle and its doulas did not need Bureau licenses, just that the investigation was fatally flawed for some unidentified reason. SUMF ¶ 86.

The withdrawal is an insincere litigation tactic. At her deposition, Bureau Chief Sanchez testified: (1) the Bureau had never issued a withdrawal before; (2) the Bureau had no process for reviewing past citations; and (3) the review was made by Ms. Sanchez and her legal counsel in this case. SUMF ¶ 87. No Bureau employee was reprimanded, and Glenn Miller (the investigator here) testified that he was never even told about the withdrawal, much less told he had done something gravely wrong. SUMF ¶¶ 88–89. Miller stands by the conclusions in his report and the Citation. SUMF ¶ 90.

For Full Circle, the withdrawal is the worst of all worlds. It is now squarely in the Bureau's

-11-

1  crosshairs as a result of this case, but now has even less idea what the Bureau thinks is legal and

2  what is not. SUMF ¶ 91. The withdrawal also demonstrates that the Bureau will issue (then affirm

3  and defend) citations that it will later renounce. Last, the withdrawal is evidence that the Bureau

4  will act in an unprincipled manner to gain advantages when dealing with Full Circle. In the doulas'

5  view, rather than diminish their need for this Court's protection, the withdrawal makes it more

6  urgent than ever.[2] SUMF ¶ 92.

7                                  **STANDARD OF REVIEW**

8          Summary judgment is appropriate when there is no genuine issue of material fact and the

9  movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby,*

10 *Inc.*, 477 U.S. 242, 247 (1986).

11                                       **ARGUMENT**

12 **I.  Plaintiffs Are Entitled to Judgment on Their Speech Claims.**

13         This Court set out the correct legal test for Plaintiffs' free-speech claims in granting the

14 preliminary injunction. Since then, discovery has confirmed that the Bureau lacks a sufficient basis

15 to restrict Plaintiffs' speech.

16     **A.  This Court's Preliminary Injunction Correctly Set Out the First Amendment Test.**

17         The Court aptly summarized Plaintiffs' free speech claims in granting the preliminary

18 injunction. Applying funeral licensure here will "prevent [Full Circle] and its volunteers from

19 giving advice about preparing for death and providing support when someone is dying"; deprive

20 the consumer Plaintiffs of the opportunity "to obtain advice from Full Circle"; and prevent Full

21 Circle "from advertising its services on its website." ECF No. 23 at 10. The Court recognized that

22 restrictions on both advice and on advertising impinge on protected speech. *See id.* at 10–11.

23         Here, Bureau regulation is triggered by the content of the speech. If the doulas give

24

25 _____
   [2] Two additional points on the withdrawal. First, it's not clear that the Bureau even has the power to withdraw
26 the Citation, which became a final agency order after Full Circle did not pursue a state-court administrative
   appeal within 30 days of the December 24, 2019 affirmance. *See* 16 C.C.R. §§ 1244–45. If Full Circle had
27 filed an untimely state-court challenge to the Citation, there can be no doubt that the Bureau's position would
   have been that the citation is inalterably set in stone. Second, the status of the Citation is ultimately irrelevant
28 because this lawsuit isn't challenging the Citation itself—the investigation, citation, affirmance, withdrawal,
   and deposition testimony are the collective basis for the injury entitling Plaintiffs to injunctive relief.

                                                                                          -12-

individualized advice about death planning and home funerals, the licensure requirements apply. If, on the other hand, they give advice on any other topic, the statutes don't apply. "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 818 (2000). As this Court explained, "when a government places limits on speech protected by the First Amendment, the restrictions must survive 'more exacting or "heightened" scrutiny,' which requires a government defendant to show at minimum that the challenged law or regulation '"advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests."'" ECF No. 23 at 11 (quoting *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020) (in turn quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997))). And as the Court noted, the Bureau did not justify its regulation with "any government interest or explain why its notice does not burden more speech than necessary to further an important interest." *Id.*[3]

In granting the preliminary injunction, the Court gave the Bureau clear guidance on what it needed to do in discovery to prevent Plaintiffs' likelihood of success on the merits from becoming a certainty. The Bureau had to produce real evidence that some compelling interest was served by restricting Full Circle's speech and that there are not reasonable, narrower alternatives.

**B. Discovery Has Confirmed the Bureau Cannot Satisfy First Amendment Scrutiny.**

**1. Individualized Advice:** The first category of speech regulation Plaintiffs have challenged is the Bureau's restrictions on giving individualized advice. The doulas provide advice in two situations: devising personalized written plans before death; and providing individualized advice in someone's home while a home funeral is underway.

The first step for the Bureau is establishing a compelling interest. "The State must specifically identify an 'actual problem' in need of solving and the curtailment of free speech must

---

[3] Because the Bureau's restrictions on Full Circle's individualized advice "regulate[] the content of the speech"—namely, "who may speak or what [they] may say"—it should be "reviewed under 'strict scrutiny': the legislation must serve a *compelling* state interest and must be *narrowly tailored* to meet that interest." *Pac. Coast Horseshoeing Sch.*, 961 F.3d at 1068 (emphases added). Whether strict scrutiny or some form of intermediate scrutiny applies is immaterial, however, because the Bureau cannot satisfy any form of heightened First Amendment scrutiny.

be actually necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011). An interest is *compelling* when it is an inflexible necessity. *E.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2011) (national security). The Supreme Court routinely refuses to characterize interests as compelling in contexts far more serious than the facts of this case. *E.g.*, *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 749 (2011) ("We have repeatedly rejected the argument that the government has a compelling state interest in 'leveling the playing field' that can justify undue burdens on political speech."); *Brown*, 564 U.S. at 800 (no compelling interest in censoring violent video games marketed to children).

California has no *compelling* interest in preventing Full Circle's doulas from giving advice about death and dying—whether in the form of a written plan or while present during a home funeral. There is no "'actual problem' in need of solving" here. *Brown*, 564 U.S. at 799. The only hypothetical interest the Bureau put forward for regulating Plaintiffs' advice is "consumer protection." *See, e.g.*, Decl. of Jeffrey Rowes In Supp. of Summ. J. ("Rowes Decl.") Ex. H at 3. Plaintiffs grant that consumer protection is a *legitimate* interest for purposes of their substantive due-process claim. *See infra* pp. 20–22. But, for free-speech purposes, no court has ever held that consumer protection is a compelling interest akin to the fight against terrorism in *Humanitarian Law Project*.

But even if consumer protection were compelling in theory, there is no actual problem in fact. Bureau Chief Sanchez conjectured that consumers *might* misperceive Full Circle doulas as licensed funeral directors. SUMF ¶ 94. But there is no evidence that has actually happened. SUMF ¶ 72. Nor is it even plausible. As this Court noted earlier, Full Circle's website has a "disclaimer in red text at the bottom of every page" saying expressly that its doulas are *not* licensed funeral directors. ECF No. 23, at 2 & n.1; *see* SUMF ¶ 36. Indeed, the doulas are emphatic about the fact that they're *not* funeral directors. SUMF ¶¶ 34–36.

There is also no evidence of actual harm. The Bureau's chief, her deputy, and the investigator who compiled the report on Full Circle testified that the Bureau has not received a single complaint about Full Circle's services or about home funerals generally, nor did the Bureau discover any evidence of consumer harm in their investigation of Full Circle. SUMF ¶¶ 73–75,

-14-

77–78. Full Circle has likewise never received a complaint from anyone it helped. SUMF ¶ 76. Indeed, the *only* complaint in existence about home funerals was the one initiating the investigation that led to this lawsuit, and all it said was that Full Circle was engaged in "[u]nlicensed activity"— not that Full Circle was harming anyone. SUMF ¶¶ 73–74. Glenn Miller, the investigator, testified that his investigation was just the turning of bureaucratic gears—a complaint came in, he was assigned to investigate, he concluded licensed activity was occurring, and the process mechanically generated a citation. SUMF ¶ 77. The Bureau never paused to ask itself if Full Circle's speech was an *actual* problem, if anyone had *actually* been harmed, or if requiring full funeral licensure made any sense at all. That kind of analysis just isn't part of the bureaucratic equation. It is, however, very much part of the First Amendment equation.

Even if requiring Full Circle and its doulas to be licensed served a compelling interest tied to an actual problem, the Bureau's application of licensure to advice would still fail for lack of tailoring. Becoming licensed as a funeral establishment and as funeral directors is prohibitively burdensome. Full Circle—a tiny nonprofit with no physical location—would have to secure a place (that it will never use) to store or embalm bodies. Its doulas (mainly retired volunteers) would have to train for and pass an exam on funeral directing. *See supra* p. 8. As a practical matter, requiring licensure will destroy Full Circle and terminate its speech. SUMF ¶ 100.

Yet, there are obvious less burdensome alternatives. Any hypothetical harm to consumers could be addressed by California's general anti-fraud and unfair-business-practices laws. *See, e.g.*, CAL. BUS. & PROF. CODE § 17200 (prohibiting any "unlawful, unfair or fraudulent business act or practice"). If the Bureau is concerned about bad advice, it can update its consumer information. What it cannot do is demand procuring a burdensome license as a condition for speaking. *See, e.g.*, *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165–66 (2002) ("It is offensive" to the First Amendment to require a citizen to "first inform the government of her desire to speak to her neighbors and then obtain a permit to do so.").

The onerous regulation of speech is especially pernicious here where it also tramples on the consumer Plaintiffs' constitutional "right to receive information and ideas." *Pac. Coast Horseshoeing Sch.*, 961 F.3d at 1069 (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)). On

-15-

this record, there isn't the faintest reason to believe that the Bureau achieves anything by preventing someone like Plaintiff Yazell from receiving valuable information and advice from a doula—whether in advance in the form of an end-of-life/home-funeral plan, or in the form of guidance/coaching during a home funeral. For example, no evidence supports the notion that Plaintiff Yazell and her family would have been better off if the Bureau had managed to prevent Akhila from being at Pamela's husband's home funeral to teach them how to wash, dress, and move his remains. What is true of the past is true of the future. No evidence supports the notion that Plaintiff Yazell and others like her will be better off if the Bureau is allowed to impose licensure on Full Circle and its doulas. To the contrary, licensure will destroy Full Circle, depriving consumers of its knowledge and teaching.

**2. Advertising:** The second class of speech regulation Plaintiffs have challenged is the Bureau's restriction on Full Circle's advertising of its services. *See* ECF No. 1 ¶¶ 236–46 (Count II). That speech receives First Amendment protection because it "concern[s] lawful activity" and is "not . . . misleading." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). Full Circle's advertising concerns lawful activity because, as shown above and below, Full Circle's services may not constitutionally be subjected to the Bureau's licensure regime. Nor is Full Circle's advertising misleading, because it accurately describes the services Full Circle offers and emphatically disclaims that Full Circle and its doulas are licensed as a funeral establishment or funeral directors. SUMF ¶¶ 34–36. The Bureau has acknowledged that it has no evidence that Full Circle's advertising inaccurately describes its services or that any consumer has been confused by Full Circle's advertising. SUMF ¶ 78.

With that showing, the Bureau must then justify its commercial-speech restrictions. "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993). But the Bureau cannot carry this burden for the same reason it can't justify restrictions on advice: the doulas aren't a danger to anyone and full funeral licensure isn't reasonably tailored to any actual problem.

**C.  The Bureau's Enforcement also Fails the Vagueness Prohibition.**

Discovery has also made clear that the Bureau's enforcement practices fail for another reason: they violate the constitutional prohibition on vague speech regulation. The "vagueness of [content-based speech] regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) (citing *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991)); *see also, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." (cleaned up)).

The key question for free-speech vagueness is whether people "of common intelligence must necessarily guess at [a statute's] meaning." *Hynes v. Mayor & Council of Oradell*, 425 U.S. 610, 620 (1976) (cleaned up). This doctrine applies when licensing laws require those who speak for a living to make impossible guesses about what they may and may not say. In *Hynes*, a New Jersey town "enacted two ordinances that together regulate most forms of door-to-door canvassing and solicitation." *Id.* at 611. Among the speaker's free-speech theories, the Supreme Court decided the case on vagueness grounds because it wasn't clear what a "recognized charitable cause" was, what a "political campaign" encompasses, or "what groups fall into the class of 'Borough Civic Groups and Organizations.'" *Id.* at 621. Just as vagueness concerns apply at the licensing phase, so too do they arise when licensed speakers try to comply based on unintelligible instructions from the regulator. In *FCC v. Fox Television Stations, Inc.*, the Court invalidated the FCC's application of indecency rules to television stations for fleeting instances of profanity and nudity during unscripted awards shows and a scripted drama. 567 U.S. 239, 247–48 (2012). The FCC imposed fines after a lengthy administrative process that relied, for example, on a "2001 Guidance and subsequent Commission decisions" to determine that certain obscenities were broadcast without being "artistically integral" to a program or part of a "bona fide news interview." *Id.* at 251–52. The lack of concrete standards was fatal to the FCC restrictions because "the due process protection against vague regulations 'does not leave [regulated parties] . . . at the mercy of *noblesse*

-17-

1  *oblige*.'" *Id.* at 255 (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010) (ellipsis and
2  brackets in original)).

3        Here, the funeral statutes, "as interpreted and enforced by the agency 'fail[ed] to provide a
4  person of ordinary intelligence fair notice of what is prohibited.'" *Id.* at 254 (quoting *United States
5  v. Williams*, 553 U.S. 285, 304 (2008)) (brackets in original). Two things became clear in
6  discovery: (1) some individualized advice requires funeral licensure; and (2) there is no way for
7  Plaintiffs to determine what speech that is because the Bureau lacks any standards. The Notice of
8  Citation provided no explanation about what speech requires licensure, SUMF ¶ 58, and Bureau
9  Chief Sanchez confirmed that the Citation's vagueness was typical for citations against those like
10  Full Circle who are not licensed by the Bureau, SUMF ¶ 60. Bureau staff refused to explain the
11  Citation to Akhila and Donna at the informal conference. The Bureau kept Glenn Miller's
12  investigative report and accompanying evidence a secret. The process is so Kafkaesque that,
13  instead of telling Akhila and Donna what Full Circle was doing wrong, Bureau staff told them to
14  hire a lawyer to tell them what the Bureau was secretly thinking in silencing them. SUMF ¶ 66.

15        Worse still, even after deposing Bureau officials under oath about the bounds of licensure,
16  it remained unclear what speech required a license. For instance, Bureau Chief Sanchez "couldn't
17  say" whether "creat[ing] an individual funeral plan" required a license, but she hinted that it may
18  when she said that "planning is stated in the [Cemetery and Funeral] Act." SUMF ¶ 93. Deputy
19  Bureau Chief Patterson said that whether "offer[ing] guidance" requires a license will "depend on
20  what that entails": "just giving verbal instructions" apparently doesn't require a license in her view,
21  but "conducting the planning" or "directing" does. SUMF ¶ 95. The investigator who
22  recommended the Citation against Full Circle was less circumspect—he said that if a doula "helps
23  [to] create [an] individualized end-of-life-plan," that would be "[o]perating in the capacity of a
24  funeral director," SUMF ¶ 96—but his interpretation both plainly restricts protected speech and is
25  inconsistent with his superiors' vacillations. Sitting here today, Plaintiffs are certain some of their
26  speech will run afoul of the Bureau's enforcement policies, but they have no idea what particular
27  speech that will be.

28        This vagueness is compounded by the unprincipled way the Bureau withdrew the Citation

-18-

after this Court granted the preliminary injunction. All of a sudden, the Bureau decided the actions it took (vetted at every level) and defended in this case for six months were actually meritless. The Bureau didn't take this action because it sincerely believed that it erred. Indeed, the written discovery and depositions took place after the withdrawal, and the Bureau defended its actions once again. SUMF ¶¶ 98–99. The lesson here is that the Bureau's standards for regulating speech are non-existent—they will take drastic actions against speech based on an anonymous complaint, refuse to disclose the details, defend their secret actions, and then strategically withdraw the decision to gain advantage (not, mind you, by saying that Plaintiffs are free to speak; just that the investigation was inadequate for mysterious, undisclosed reasons). The vagueness doctrine doesn't allow the government to play these sorts of games with speech.

## II. Plaintiffs Are Entitled to Judgment on Their Due-Process Claim.

### A. Requiring Full Circle and Its Doulas To Be Licensed Violates Substantive Due Process.

In contrast to the speech claims, the Fourteenth Amendment substantive due-process claim involves conduct: practical, hands-on assistance during a home funeral. This consists mainly of showing families how to do simple, legal things that they just don't have experience doing—*e.g.*, moving remains from a bed to the living room, undressing, washing, and dressing remains, and placing dry ice under remains for temporary preservation. *See supra* pp. 6–7. Often, the doulas help the families implement the written plan that the doulas and the deceased created earlier. SUMF ¶ 27. In addition to the practical advice and assistance, doulas provide emotional support for mourning families striving to honor their loved one. SUMF ¶ 28.

The government violates substantive due process when it irrationally treats *different* things as though they are the same. *Merrifield v. Lockyer*, 547 F.3d 978, 986 (9th Cir. 2008) (explaining the difference between substantive due process and equal protection). Here, Plaintiffs argue that the Bureau is irrationally doing just that: treating Full Circle and its doulas as though they are a funeral establishment and funeral directors.

The standard of review is rational basis. To survive, the Bureau's application of funeral licensure to Full Circle and its doulas must be rationally related to a legitimate government interest.

-19-

1   Plaintiffs concede that the Bureau has legitimate interests in consumer protection. But the Bureau's

2   application of the law will fail if it "is *unrelated* to these interests." *Merrifield*, 947 F.3d at 986.

3   　　　Plaintiffs may use evidence to demonstrate that the government's asserted justifications are

4   irrational. "[A]lthough rational basis review places no affirmative evidentiary burden on the

5   government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing

6   evidence of irrationality." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013).

7   Whatever deference the Bureau is owed, "a hypothetical rationale, even post hoc, cannot be

8   fantasy"; the Bureau isn't entitled to "judicial blindness to the history of a challenged rule or the

9   context of its adoption," and courts need not accept "nonsensical explanations for regulation." *Id.*

10  at 223, 226.

11  　　**B.  *St. Joseph Abbey* Provides a Direct Path to Judgment for Plaintiffs.**

12  　　　This Court need not reinvent the wheel. The leading case involving a constitutional

13  challenge to funeral-licensing laws is *St. Joseph Abbey*. Its facts are materially analogous to those

14  here and so its analysis is likewise directly applicable. There, the monks of St. Joseph Abbey

15  wanted to earn a living through a traditional funeral practice—handmaking and selling simple

16  wooden caskets. But they ran into the same two "significant regulatory burdens" the doulas now

17  face: "sales of caskets to the public may be made only by a state-licensed funeral director and only

18  at a state-licensed funeral home." *Id.* at 218. The question was whether Louisiana could treat a

19  monastery and monks as though they were a funeral establishment and funeral directors. That

20  tracks the question here: May the Bureau treat Full Circle and its doulas as though they are a

21  funeral establishment and funeral directors?

22  　　　**1.  Consumer Protection:** The Fifth Circuit began with Louisiana's asserted consumer-

23  protection justification. Licensure, the state argued, "restricts predatory sales practices by third-

24  party sellers and protects consumers from purchasing a casket that is not suitable." *Id.* at 223. In

25  the abstract, that was a "perfectly rational statement of hypothesized footings for the challenged

26  law." *Id.* So, too, here. The Bureau contends that funeral licensure generally advances "the

27  Bureau's mission of consumer protection." Rowes Decl. Ex. H at 3.

28  　　　But Louisiana's bare assertion about consumer protection didn't carry the day because "it

-20-

[wa]s betrayed by the undisputed facts." *St. Joseph Abbey*, 712 F.3d at 223. The monks used record evidence to refute the state's consumer-protection justifications. The evidence established that making a monastery and monks become fully licensed was irrationally overbroad. "No provision mandates licensure requirements for casket retailers." *Id.* Rather, the monks were swept into a comprehensive licensing scheme "built on the statute's interlocking definitions of 'funeral establishment' and 'funeral directing.'" *Id.* Because a "funeral establishment includes any 'office or place for the practice of funeral directing' and 'funeral directing' includes 'the purchase of caskets,'" the mere act of selling a casket required full compliance with the licensing scheme. *Id.* at 224. This scheme, then, was not about addressing specific problems with casket-selling. As such, it was irrationally overbroad—it made no sense to force the monks to turn their monastery into a funeral establishment (with, for example, embalming facilities) and monks into funeral directors just to sell wooden caskets.

That is exactly what is happening here. The doulas want to help families hold home funerals in private homes by offering practical assistance with simple, but often unfamiliar, tasks that any layperson can perform. For example, Akhila might buy dry ice at the grocery store and show family members how and where to place it to keep remains cool. SUMF ¶¶ 25–26. Or she might help them wash and dress a loved one. SUMF ¶¶ 25. But these acts, the Bureau believes, constitute "the preparation . . . of human remains." CAL. BUS. & PROF. CODE § 7616(a); SUMF ¶ 99. And so the doulas are swept into a comprehensive licensing scheme "built on the statute's interlocking definitions of 'funeral establishment' and 'funeral directing.'" *St. Joseph Abbey*, 712 F.3d at 223. Yet that has the same irrational overbreadth: treating Full Circle, which has no physical location, as though it needs a place to store and embalm bodies; and treating the doulas as though they perform the technical tasks of a funeral director such as embalming or holding large sums in trust to be used in the future for expensive goods and services that the funeral director has presold.

Louisiana's irrational overbreadth was compounded by the fact that applying the law had no discernable benefit, not even in theory. "Louisiana does not require a person to be buried in a casket, restrict casket purchases in any way by Louisianans over the internet or from other sources out of state, nor imposes requirements on any intrastate seller of caskets." *Id.* at 224. On top of

-21-

that, the Federal Trade Commission and Louisiana authorized funeral directors to require "a non-declinable service fee, which contractually binds a funeral director to assist the customer with burial and funeral logistics, including, for example, casket selection, even if the customer does not purchase the casket from the funeral director." *Id.* at 225. "As a consequence," every time someone dies in Louisiana, "the customer should receive the benefit of the funeral director's experience in matters of casket selection." *Id.* Forcing the consumer to pay a funeral director the non-declinable service fee and then forcing the consumer to buy the casket from the same funeral director amounted to consumer exploitation, not protection.

Again, that is the same here. California doesn't regulate home funerals. They are perfectly legal. Laypeople are allowed to wash and dress remains, preserve them with dry ice available at any grocery store, and conduct their own memorial rites. *See supra* pp. 5–7. Moreover, as in Louisiana, California families have ample access to funeral directors. Just as the monks handled only the casket, the doulas here assist only with the home funeral. Families still need to hire a funeral director to transport the remains from the home to the cemetery or crematory if they do not wish to do so themselves, as is almost always the case. SUMF ¶ 33. To do this, families must hire the funeral director and pay the non-declinable basic services fee. So families who do not want to do everything themselves—which they are legally allowed to do—will always have a funeral director at their disposal to offer additional guidance for the home funeral. In sum, forcing Full Circle and its doulas to become licensed adds nothing (and costs everything because it will destroy Full Circle).

**2. Health and Safety**: In *St. Joseph Abbey*, the Fifth Circuit rejected any notion that public safety required monks to be licensed funeral directors to sell caskets because "this purported rationale for the challenged law elides the realities of Louisiana's regulation of caskets and burials." 712 F.3d at 226. Reality, as established by the record, was that "Louisiana does not even require a casket for burial, does not impose requirements for their construction or design, does not require a casket to be sealed before burial, and does not require funeral directors to have any special expertise in caskets." *Id.* With that context in mind, "no rational relationship exists between public health and safety" and requiring monks to become funeral directors to sell caskets. *Id.*

-22-

That reasoning applies here. There are no rules or standards about health and safety for a home funeral—no rules prohibiting them, requiring remains to be preserved in a certain way, requiring special clothing or other coverings for remains. Home funerals are perfectly safe for laypeople to handle. Given that, it cannot rationally be the case that health-and-safety considerations arise when families invite doulas into their home to help. Doulas, with their practical experience, can't possibly make home funerals *less* safe.

***

Though deferential, rational-basis review is a meaningful limitation on economic regulations. When plaintiffs adduce evidence refuting the government's asserted justifications, the challenged statute or enforcement fails. *See, e.g.*, *Wal-Mart Stores, Inc. v. Knickrehm*, 101 F. Supp. 2d 749, 764 (E.D. Ark. 2000) (striking down pharmacy regulations because "the Department admitted that it has no evidence" of harm). This is especially true in the funeral industry. *See Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002) (funeral-establishment licensing); *Casket Royale, Inc. v. Mississippi*, 124 F. Supp. 2d 434 (S.D. Miss. 2000) (same); *Peachtree Caskets Direct, Inc. v. State Bd. of Funeral Serv.*, No. 1:19-cv-3084, 1999 WL 33651794 (N.D. Ga. Feb. 9, 1999) (same). And it is true in other occupational-licensing challenges here in California. *See Merrifield*, 547 F.3d 978 (exterminator licensing); *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101 (S.D. Cal. 1999) (hairbraiding). Simply put, the Bureau's application of funeral licensing to Full Circle and its EOL doulas has no plausible basis in reality, and thus it falls into that atypical category of government action that fails rational-basis review.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully ask the Court to grant them summary judgment on all their claims and to enter a permanent injunction.

1  Dated: November 19, 2021.                    Respectfully submitted,

2                                                /s/ Jeff Rowes

3  Derek M. Mayor (CA Bar No. 307171)           Jeff Rowes* (TX Bar No. 24104956)
   PILLSBURY WINTHROP SHAW PITTMAN LLP           INSTITUTE FOR JUSTICE
   500 Capitol Mall, Suite 1800                  816 Congress Ave., Suite 960
4  Sacramento, CA 95814                          Austin, TX 78701
   (916) 329-4703                                (512) 480-5936
5  derek.mayor@pillsburylaw.com                  jrowes@ij.org

6

7  Thomas V. Loran III (CA Bar No. 95255)        Benjamin A. Field* (NY Bar No. 5430129)
   PILLSBURY WINTHROP SHAW PITTMAN LLP           INSTITUTE FOR JUSTICE
   Four Embarcadero Center, 22nd Floor           901 N. Glebe Rd., Suite 900
8  San Francisco, CA 94111                       Arlington, VA 22203
   (415) 983-1865                                (703) 682-9320
9  thomas.loran@pillsburylaw.com                 bfield@ij.org

10                                               *Admitted *pro hac vice*

11                                               Attorneys for Plaintiffs

12

13                        **<u>CERTIFICATE OF SERVICE</u>**

14        I hereby certify under penalty of perjury that a copy of the foregoing was served on all

15  counsel of record via the Court's CM/ECF system on all counsel of record.

16

17                                               /s/ Jeff Rowes

18                                               Jeff Rowes

19                                               *Attorney for Plaintiffs*

20

21

22

23

24

25

26

27

28

                                                                              -24-